## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 (Subchapter V) |
| | ) | |
| PHYSIQ, INC. [1] | ) | Case No. 23-10102 (BLS) |
| | ) | |
| Debtor. | ) | |
| | ) | |

## DECLARATION OF GARY CONKRIGHT IN SUPPORT OF THE
## DEBTOR'S CHAPTER 11 PETITION AND FIRST DAY RELIEF

I, Gary Conkright, hereby declare under penalty of perjury the following is true to the best of my knowledge, information, and belief:

1.      I am the Chairman, Chief Executive Officer, and Co-Founder of physIQ, Inc. (the "Debtor" or the "Company").  As a result of my tenure with the Company from its inception, I am intimately familiar with the Debtor's business, financial affairs, and day-to-day operations.

2.      Prior to co-founding the Company, I was the founding CEO and Chairman of SmartSignal Corporation (now part of GE), a Chicago-based enterprise software firm, incubated by the University of Chicago to commercialize predictive analytics technology developed at Argonne National Laboratory.  Over the past 20 years, serving as CEO of venture-backed technology start-ups, I have secured over $90 million in venture capital to bring game-changing proprietary technology from laboratory to commercial success.  I have an MBA from the University of Chicago Booth Graduate School of Business and a BS in Aeronautical Engineering from Purdue University. I am also the named inventor on three U.S. patents.

---

[1] The last four digits of the Debtor's federal tax identification number is 6980. The Debtor's address is 200 W. Jackson Blvd., Suite 550, Chicago, IL 60606.

3.      On the date hereof (the "Petition Date"), the Debtor commenced a case (the "Chapter 11 Case") by filing a petition for relief under subchapter V of chapter 11 of title 11 of the United States Code, §§ 101 *et seq.* (the "Bankruptcy Code"), in the United States Bankruptcy Court for the District of Delaware (the "Court").

4.      I submit this Declaration to provide an overview of the Debtor's business and the Chapter 11 Case and to support the Debtor's "first day" applications and motions (collectively, the "First Day Motions"). I am over the age of 18, competent to testify, and authorized to submit this Declaration on behalf of the Debtor.

5.      Except as otherwise noted, I have personal knowledge of the matters set forth herein. All facts set forth in the Declaration are based on my personal knowledge, my discussions with other members of the Debtor's senior management, my review of relevant documents, and/or my opinion based on my experience and knowledge of the Debtor's operations and financial condition. In making the Declaration, I have relied in part on information and materials that the Debtor's personnel and advisors have gathered, prepared, verified, and provided to me, in each case under my ultimate supervision, at my direction, and/or for my benefit in preparing the Declaration. If I were called to testify as a witness in this matter, I could and would testify competently to the facts set forth herein.

### Preliminary Statement

6.      The Debtor is a "start-up" healthcare technology company with exciting prospects but very limited liquidity.  Simply stated, the Debtor commenced this Chapter 11 Case in order to obtain access to secured financing that could provide working capital for the Debtor to use as a bridge to a larger recapitalization or alternate liquidity event.  Though the Debtor and its assets are currently unencumbered by any liens or security interests, the Debtor faced severe liquidity challenges prior to the Petition Date. Those challenges threatened the

Debtor's ability to continue operations and satisfy payroll and other operating obligations, let alone recapitalize its business.

7.     To continue its operations while it pursues a recapitalization, the Debtor obtained a commitment for secured financing from PhysIQ Lending Group, LLC (the "Lender").  However, the Lender was unwilling to go forward with the financing unless (i) the Debtor (A) filed a chapter 11 bankruptcy case, and (B) obtained bankruptcy court approval of the financing, and (ii) the Lender received the protections contemplated by section 364 of the Bankruptcy Code. The Debtor therefore filed the Chapter 11 Case in order to move forward with a secured financing facility that would support the Debtor's operations while it pursued a recapitalization under the auspices of a chapter 11 plan.

8.     To familiarize the Court with the Debtor and the relief the Debtor seeks at the beginning of this Chapter 11 Case, this Declaration is organized in three sections. The first section provides background information with respect to the Debtor's business.  The second section describes the circumstances surrounding the commencement of this Chapter 11 Case. The last section sets forth the relevant facts in support of each of the First Day Motions.

## The Debtor's Business

9.     The Debtor is a startup company that provides analytics through a software platform to health care and life science providers.  Specifically, the Debtor provides an FDA cleared data analytic platform that allows for its health care and life science customers to accurately detect, assess and analyze the physiologic changes to an individual based upon various internal and external stimuli. Stimuli include pharmaceuticals, exercise, vaccines, sleep, stress, and other internal and external factors that impact an individual and the physiologic response from the individual in terms of objectively measured data, such as heart rate, temperature, respiration, blood pressure, etc.

3

10.     By combining its proprietary artificial intelligence with several commercially available wearable biosensors, the Debtor's analytic platform permits continuous monitoring of individual patients.  That real-time monitoring allows clinical trial sponsors and clinicians to more accurately understand an individual's physiology, proactively detect and act upon physiological decompositions, improve safety and efficacy of new therapies, and deliver clinical interventions to improve patient outcomes.

11.     As of the Petition Date, the Debtor employed approximately 58 full-time and part-time employees.  None of the Debtor's employees are subject to a collective bargaining agreement.

12.     The Debtor is headquartered in Chicago, Illinois with a satellite office in Naperville, Illinois.  Employees working from the corporate headquarters generally handle critical corporate and back-office functions. Many employees work remotely as a result of the Covid-19 pandemic and other factors.

13.     While the Debtor does not own any real property, it does own valuable proprietary technology and intellectual property, including 21 global patents (7 pending) and 5 FDA-cleared digital biomarkers (with 9 more in development) and a data trove that is valuable in the development and validation of additional digital biomarkers. This proprietary technology and its further development by the Debtor's dedicated scientists and clinicians are the cornerstones of the Debtor's business.

14.     Prior to the Petition Date, the Debtor had no secured debt.  As of the Petition Date, the Debtor estimates that it owes approximately $6.8 million of unsecured indebtedness, including prepaid revenue, trade debt and payables.

4

15.     The Debtor has raised capital in several rounds of sales of preferred stock in the Debtor.  The various preferred rounds of stock represent over seventy percent of the ownership of the Debtor and the various classes have the same economic rights and preferences, other than the liquidation preference for each class of preferred stock, which arises from the price paid in the different rounds of equity sales. The common stock of the Debtor, representing the remainder of the capital interest of the Debtor, is held by the founders who hold common stock and/or employees holding options to acquire common stock (roughly half issued common stock and half options to acquire common stock). There are also outstanding warrants to acquire both preferred and common stock which are included as a small portion within the percentages set forth above.

## Events Leading to Chapter 11

16.     The Debtor, like many start-up companies, particularly in the field of life science and health care software products and solutions, has an offering that takes a significant amount of time and capital to achieve wide-spread adoption from extremely large customers.  Large pharmaceutical companies and health care providers are slow to adopt new technology and change practices.

17.     After advancing its product to achieve a perceived market fit, which included receiving FDA clearance of its medical device platform and gaining some customer feedback and commercial traction, the Debtor believed its customer base was prepared to expand commercial use of the product, and after receiving funding in May 2021, it hired sales personnel and other staff with an eye toward rapid sales revenue growth.  Despite the promise the Debtor saw from the market, and for a variety of reasons, the rapid growth did not materialize in the time anticipated. The Debtor deployed its available capital based on its anticipated plans and budgets, but with the delay in anticipated sales, the Debtor is again in

5

need of additional financing.  The Debtor has since dedicated its efforts to generating additional capital.  In April of 2022, the Debtor retained the investment banking firm of Cowen and Company, LLC ("Cowen") to assist in those capital raising efforts and to evaluate various avenues to improve the Debtor's liquidity and financial position.

18.     However, the disruptive actions by a single preferred shareholder (Scrapper Technology Funder LLC ("Scrapper")) with a large stake in the Debtor (25% of issued preferred stock) has had a material chilling effect on its ability to raise new capital and traditional venture debt.  Those disruptive actions included the July 2022 filing of a lawsuit in Illinois state court (styled as *Scrapper Technology Funder LLC v. PhysIQ, Inc. et al.*; Cook Cty Cir Ct. Case No. 2022L006454) in which Scrapper has accused the Debtor of fraud and breach of contract in connection with Scrapper's acquisition of its preferred stock.  Although the Debtor denies Scrapper's allegations and has moved to dismiss the complaint on the basis of its multiple legal and factual defects, the Illinois state court granted Scrapper leave to replead its complaint.[2]

19.     The Debtor and its advisors continue to believe that the market still provides a massive opportunity for its proprietary technology and that the rapid growth phase remains within reach with several large new customer contracts currently in process.  To move more cautiously toward this phase of growth, the Debtor has scaled back its staff.  It has also remained focused on raising capital from private investors with the assistance of Cowen, and it is in various stages of diligence and discussion with several potential long-term investors.  The recent economic downturn in company valuations and private equity investing generally, has delayed and has had a detrimental impact on this process, but the process is on-going.

---

[2] The amended complaint is currently due to be filed on or before February 1, 2023.

20.     By the end of 2022, the Company was running out of cash and was unable to secure additional financing or investment capital to finance additional growth or support operations. The Debtor had attempted to obtain bridge financing from various sources.  Given the pendency of the Scrapper dispute, however, the Debtor was successful in only one of its attempts.  As noted above, the Debtor obtained a commitment from the Lender to provide bridge financing.  But that commitment was conditioned upon the Debtor's filing of a chapter 11 case and bankruptcy court approval of the financing together with the protections that the Bankruptcy Code provides to debtor in possession financing.  In light of the Debtor's severe liquidity problems, its consequent need for the Lender's financing, and the opportunity that chapter 11 presented as a platform to effectuate a larger recapitalization, the Debtor decided to file this Chapter 11 Case.  The Debtor believes that the commencement of this Chapter 11 Case represents its best option to maintain its operations, preserve and maximize value for the benefit of all of its stakeholders, and effect a comprehensive recapitalization.

## Relief Sought in the First Day Motions

### A.     Cash Management Motion

21.     By the Cash Management Motion, the Debtor requests interim and final (i) authority to continue using its existing cash management system (the "Cash Management System") including the payment of all fees related thereto; (ii) authority for continued use of its existing business forms; and (iii) related relief.

22.     In the ordinary course of business, the Debtor utilizes its Cash Management System to collect, manage, and disburse funds used in its business. The Cash Management System, including the Bank Accounts and the Credit Card (both as defined in the Cash Management Motion), is essential to the stability of the Debtor's assets and business objectives, and to maximizing the value of its estate. Any disruption to the Cash Management

7

System would unnecessarily and significantly disrupt the Debtor's operations and impede the successful administration of its Chapter 11 Case.

23.     I believe that the relief requested in the Cash Management Motion is in the best interests of the Debtor's estate, its creditors, and all other parties in interest, and will enable the Debtor to continue to operate its business in this Chapter 11 Case with minimal disruption, thereby benefiting all parties in interest. Accordingly, for the reasons set forth herein and in the Cash Management Motion, on behalf of the Debtor, I respectfully submit that the relief requested in the Cash Management Motion should be granted.

**B.      Wage Motion**

24.     By the Wage Motion, the Debtor seeks entry of interim and final orders (a) authorizing the Debtor to (i) pay prepetition wages, salaries, other compensation, and reimburse employee expenses, and (ii) continue employee benefits programs in the ordinary course, including payment of certain prepetition obligations related thereto; and (b) granting related relief.

25.     The Debtor's workforce performs a variety of functions critical to the Debtor's operations and the administration of the Debtor's estate. The individuals covered by the Wage Motion are intimately familiar with the Debtor's business, processes, and systems, and they cannot be easily replaced. The Debtor's failure to honor its obligations to its workforce could lead to considerable attrition, which would severely threaten the Debtor's ability to operate at this crucial juncture. Indeed, without the continued, uninterrupted services of its employees and other individuals covered by the Wage Motion, the Debtor simply could not run its business and maximize value for the benefit of all stakeholders.

26.     More importantly, many of the individuals covered by the Wage Motion rely on the compensation and benefits they receive to pay daily living expenses and secure services

central to their health and welfare. As such, the Debtor's workforce would be exposed to significant hardship if the Debtor is not permitted to continue satisfying the obligations described in the Wage Motion,

27.    Accordingly, for the reasons set forth herein and described in the Wage Motion, on behalf of the Debtor, I respectfully submit that the relief requested in the Wage Motion is in the best interests of the Debtor's estates, its creditors, and all other parties in interest, and will enable the Debtor to continue to operate its business in the Chapter 11 Case with minimal disruption, thereby maximizing value for the Debtor's estate.

### C.    DIP Financing Motion

28.    Prior to the Petition Date, the Debtor faced severe liquidity challenges and recognized a need for further outside financing to bridge to the closing of a larger capital raise. The Debtor carefully considered its financing options given the existence of the Scrapper dispute and the deleterious effect it had on attracting adequate financing.  Having been unsuccessful in attracting any secured financing other than the DIP Financing offered by the Lender, the Debtor is certainly unable to obtain unsecured credit allowable purely as an administrative expense in the Chapter 11 Case.

29.    Ultimately, the Debtor determined that the DIP Financing offered by the Lender provides the Debtor with the best postpetition financing option available to it under the circumstances and should be approved by this Court.  After extensive arms' length and good faith negotiations with the Lender, the Debtor, in an exercise of its sound business judgment, determined that the terms of the proposed DIP Financing were fair and reasonable in all respects and should be approved by this Court.

30.    The Debtor's estate will suffer immediate and irreparable harm if the relief requested in the DIP Motion is not granted.  The Debtor does not have sufficient cash on hand

to meet its upcoming payroll obligations or otherwise fund this Chapter 11 Case, and thus access to the proposed DIP Financing is critical to ensure the Debtor's smooth entry into Chapter 11. The commencement of this Chapter 11 Case will place increased demands on the Debtor's liquidity due to, among other things, the costs of administering the Chapter 11 Case. The relief requested is necessary to avoid the immediate and irreparable harm that would otherwise result if the Debtor is denied the proposed interim and final borrowings, including, among other things, frustrating the Debtor's ability to successfully navigate the Chapter 11 Case.

31.     The DIP Financing has been evaluated by the Debtor and its professionals, and it will provide sufficient liquidity to fund the Chapter 11 Case. The Debtor negotiated the DIP Financing in good faith and at arms' length, and I submit that the terms of the DIP Facility are reasonable and the best that could be obtained under the facts and circumstances of this Chapter 11 Case.

32.     Accordingly, for the reasons set forth herein and expanded on in the DIP Motion, on behalf of the Debtor, I respectfully submit that the relief requested therein is in the best interests of the Debtor's estate, its creditors, and all other parties in interest, and will enable the Debtor to continue to operate its business in the Chapter 11 Case with minimal disruption, thereby maximizing value for the estate.

LEGAL\61153923\6

## Conclusion

33.     I have reviewed each of the First Day Motions. All of the facts set forth in the First Day Motions are true and correct to the best of my knowledge and belief based upon (a) my personal knowledge of the Debtor's operations and finances, (b) information learned from my review of relevant documents, (c) information supplied to me by other members of the Debtor's management team and the Debtor's advisors, and/or (d) my opinion based upon my knowledge and experience or information I have reviewed concerning the Debtor's operations and financial condition. Accordingly, on behalf of the Debtor, I respectfully request that the relief requested in each of the First Day Motions be granted because such relief is a critical element in stabilizing and facilitating the Debtor's operations during the pendency of the Chapter 11 Case.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that, to the best of my knowledge and after reasonable inquiry, the foregoing is true and correct.

Dated: January 26, 2023

Gary Conkright